11-1241 Gomez v. Feissner et al. Mr. Norton, Mr. Coons, and Mr. Judge. Whenever you're ready. Good morning, Your Honor. May it please the court, my name is Lawrence Norton. I represent the appellants in this matter. I'd like one minute to reserve one minute for rebuttal. That's fine. The plaintiffs in this case and the appellants are a family, a father, his mother, and his two children. At the time that this raid occurred in 2007, it was a 16-year-old boy and a 9-year-old daughter. None of these folks were targets of any criminal investigation. The raid occurred in the apartment that was adjacent to theirs, number 11. We've got the facts. How exactly was this door sealed that was between number 11 and number 9? Your Honor, it was sealed with plastic stripping that was nailed to the door and the door frame. Was the door actually nailed shut? Because there was no lock. The stripping was nailed to the door frame. There's a photograph that's an exhibit. You have some exhibits there. I think the crier was good enough to mark those. One of them is at record 432E. And that shows the... Do we have free copy? Yeah, I'm going to give you my copy. I apologize for this. You tried. What was ours? There aren't any. Yeah, we don't have a document reader. But if you look at 432E, what you'll see is that door from my client's side, the number 9 side, and this was taken by my client after the raid. And he put the door back up the way it was. He's testified that this is the way it was before the raid. And you will see plastic stripping that's nailed on to the door and the door frame. But, of course, you couldn't see that from when you're coming from 11, right? You could not see it. And that's the reason why we have conceded all along in this case that there was no constitutional violation because reasonable officers could have thought that when they were in that bathroom in number 11 that the door that they were looking at might have led to another room in number 11. So at what point does it become a constitutional violation? We appreciate your candor and concession, right? So they open the door and they go in. They open the door and they go in. And we also concede that after they go in, they have the right to do a protective sweep because now that area is open. It's a matter of safety. Whether there's someone in there that can harm them while they're doing the search in number 11.  that that protective sweep ended within 5 to 15 minutes of the initiation of this raid. So our view is that at that point, 5 to 15 minutes into this raid, they had no right to remain there. They should have withdrawn. And the law was clearly established at the time, both in U.S. v. Ritter, a decision of this court, and Garrison v. Merrill. Does it make any difference that the person who was the target here, his name was Guerrero, is that right? Guerrero. That he had access or control over the premises in 9? In 9. 9 as opposed to 11. If he had access and control over the premises in 9, that would have given the officers, when they were doing their surveillance. They surveilled this house for a long time. They surveilled from both sides, number 9 and number 11. They saw him, testimony was they saw him at least once go into the doorway. Not through the bathroom, but through the doorway into number 11. Or 9, rather. If they had thought they had enough information to search number 9 as well as number 11, yes. If they could show that, and the cases that are cited by the state in this case are cases for the proposition that, oh, you can get a search warrant for two units in a building if you can show that there's control over the other unit by the perpetrator or the alleged perpetrator. There was no evidence to show that, and, of course, they didn't come up with any evidence either because there wasn't any. Can we go back chronologically? All right, so they open the door. They do a protective sweep. Yes. For safety reasons and all. At what point should they have retreated or left the apartment, realizing that it's apartment 9 and it's not the apartment covered by the warrant? Five to 15 minutes. What should have given them notice? Well, let me put it this way. Or did give them notice. There were a number of defendants. We sued a number of officers. We dismissed the case against a bunch of them. And the only two remaining of the state officers are Feissner, who was in charge of this operation at this locale, and Zola, who was in charge of the entry team. They had coordinated this whole operation. They were in charge. Zola had testified at his deposition that he went through that doorway. Now, we've argued, and I think fairly persuasively, that there is a lot of evidence to show that they had to knock that door down. They had to kick the door in. Okay, that's an issue of fact. That's an issue of fact. Is that a material issue of fact? Yes, it is. Well, you just conceded that you're not saying there's a constitutional violation there. No, but Zola, the evidence shows, we think, that Zola kicked that door in. So he can go in through that door thinking he might have 11 on the other side. But once he realizes, as he testified he did, he went downstairs, saw a complete kitchen, saw the doorways leading out to number nine, he knew at that point he was on the other side of the building. So that's what gave him notice that he was in a different unit. They had a lot of things in advance. There were two electrical meters on the house. There were trash cans up there. Two satellites. But then when he had to kick that door in and then went down and saw he was in another place, he knew it at that point that now he had gone into number 11. He says one of the reasons he didn't do anything, he said, well, I just continued with my work. I didn't go back and talk to Feisner and say, hey, we went into another unit. The reason is, he said, I thought, truthfully he said, I thought at that time they were involved. So I think a jury could conclude that he went on thinking they were going to find evidence. Well, the proper thing at that point, you've done your protective sweep, you have a magistrate waiting to issue a search warrant, go back and show whether there's probable cause. They didn't have it, but that would be the proper thing. You can't just go through that for three hours, take a police dog through their place, detain these people, take the 16-year-old in cuffs downtown to the armory. He was there for three hours at the armory, then told to walk home. All of that because they went in the wrong place. Feisner, the evidence is a little bit different with respect to Feisner, when he should have known it. Was there evidence initially that they had agreed to take him to school, the 16-year-old? Yes. There's a lot of evidence. In fact, even the ICE officers testified their depositions. Oh, we thought he was going to school. He asked to go to school. We thought they were taking him to school. He thought he was going to school. When initially did the Tavares family tell them, hey, you've got the wrong people here? This is a separate unit. It's not very clear, Your Honor, and part of the problem is that my clients didn't realize what was happening. They didn't know why the officer – at first, they thought it was robbers coming in. After a while, a minute or so, they realized these are police officers, SWAT team. They've got helmets on and everything else. They didn't know why they were there. And they don't speak English very well, except the children, and so it was probably an hour or more before they realized, oh, the reason they're in our place is because they have a warrant for number 11. They didn't realize that. They didn't know what was happening. So our contention is that five of – well, let me go back to Officer Feisner. Let's assume for the moment that you established there was a violation of the constitutional right, especially in light of garrison. Once they found that they were in another unit, they had to discontinue. But was it a clearly established right that the Tavares said – in other words, you have to violate a constitutional right and it must be a clearly established constitutional right? Well, it's the United States Supreme Court, Your Honor, and the Third Circuit Court of Appeals in the circuit, and both of them say that the – Ritter says, and I quote, the air – once reasonable officers should know the air and what they encountered versus what is authorized by the warrant, they're obligated to either limit the search to those areas clearly covered by the warrant or discontinue the search. Are you talking here about the local officials, local officers Zola and Feisner? Yes. Or are you – okay. Yes. We have not – our only claim against the federal officers has to do with the statement they made that caused my client to stop speaking in his own home. We have not said that those officers, because of their role, that they violated Fourth Amendment rights. Now, as to those – well, let me just say as to Feisner first. Officer Feisner, even though he was in control of this search, he says, oh, I really didn't go down through the whole building for a long time. It's not clear exactly when, an hour or more. My clients, however, testify that within – at the end of this 15 minutes, Officer Feisner took them down from their house, down the hall, down into their kitchen, the other kitchen, and out through the garage and up to the kitchen in number nine. And it is – going into that kitchen is at the point where Officer Feisner knew or should have known that he was now on the other side of the building. Zola says he knew it immediately when he went in that kitchen. One of the ICE agents said, when he went into the kitchen, he said, oh, another kitchen. So we think that it's pretty clear that Feisner knew that also at the end of that 15-minute period. Now, with respect to the federal agents, we are saying that these agents, number one, they were in the property. They were authorized to be in the property, not because they got a warrant or had any legal right to be there, but because the state task force said, come with us. You can come help us out. So they had the privilege to be in my client's home that morning because of the state. And secondly, the testimony is clear. Feisner, who was in charge of that team, says he assigned to those ICE agents one of the tasks was to be the custodians of the residents of that house. So he was assigned that by state officials. And so it is our view that we have met the test in Lugar versus Edmondson, and they are acting under state law. If you don't have a 1983 claim, is the crux of your cause of action against an equal protection? Yeah, it is. That's the way I read your brief. But is threatening to handcuff someone, how do you find that to be a constitutional violation? Because it's threatening to handcuff someone because you are not a citizen if you do not stop speaking. And it caused him to stop speaking. So the constitutional right is both a First Amendment right to be able to speak and exercise his personal right to speak in his home. And the reason that he is told and the reason for their action is because he's not a citizen. Where is it clearly established that threatening to handcuff somebody and maybe making, if true, an inappropriate comment that you can't speak in effect because you're an illegal alien, where is it said that somebody saying that somehow has clearly violated a clearly established constitutional right? Well, Your Honor, the... You're saying Lugar? Well, Lugar, I'm not saying Lugar stands for that proposition. No, Your Honor. So what sets it out that no can do here? Citizens have the First Amendment right as do, or non-citizens have the First Amendment right as do citizens, and that's Bridges v. Wixon, 1945 United States Supreme Court. And they also are protected by equal protection laws. Non-citizens who are here are protected by equal protection. I think your adversary points out, isn't there a pleading problem here? I mean, you don't see equal protection in the complaint. You don't see that a particular allegation that the defendants acted with a discriminatory purpose. Isn't there a problem there with your pleading? Your Honor, I think that there are a number of different claims we're relying on against these officers, and one of the claims is the, and probably the clearest, I will concede, one of the clearest claims in the complaint is the 1981 claim. Now, you'd have to find that they were acting under color of law, state law, not only as federal officers. But paragraphs 50 and 51 of the complaint deal with that, and in both cases they say, in taking the above actions depriving plaintiffs of rights protected by their Fourth, Fifth, Fourteenth Amendments of the Constitution, defendants intended to deny plaintiffs rights enjoyed by white citizens of the United States. And in the complaint, it's clear, we've also alleged in the complaint, that the defendants' unreasonable intrusion, seizures, and searches were motivated, at least in part, by defendants' animus toward people of Hispanic origin and those who are non-citizens. And to kind of eliminate the Iqbal problem and Twombly problem here in this case, which has to do with really not alleging sufficient facts in the complaint, the complaint alleges when Plaintiff William Tavares asked why defendants were bothering them in Number 9 when their arrest warrant was for Number 11, one defendant told William to shut up, you're not a citizen. Now, it subsequently came out at depositions who the defendant was. We didn't know who it was at the time this was filed. These were officers who were, who were masked, et cetera, but it came out at depositions. That was Cristino that said that, right? That was Cristino who said it, Your Honor. Okay. Why don't we hear from Mr. Coons. Thank you, Your Honor. May it please the Court, my name is Calvin Coons. I represent officers Feisner and Zola. Let's, in Mr. Zola's deposition, he stated that he knew he was in Number 9 when he entered the kitchen. Well, yes. Is that correct? Yes, Your Honor. Well, yes, he did say he knew he was in that part of the house. And when did Feisner discover that he had entered Number 9? Well, let me, first of all, Your Honor, if I may back up, the fact that Feisner said that he was in Number 9, he didn't conclude that that was a separate residence, which we think is the issue in the case. Feisner. Zola's the one who sort of led the charge. Yeah, he led the charge, Your Honor. I mean, he's the one who got the affidavit to get the warrant. I don't really see that there can be any claim against him because he says his team led the charge. They left within 5 or 10 minutes, he says. And he says that even though he knew he was in Number 9 when he went in the kitchen, he did say that. When you say he left, did you mean Feisner said he left? No, I'm sorry. That was Mr. Zola, Mr. Zola, Officer Zola. I've got in your brief that it looks to me like on page 11 of your brief, maybe it's the appellant brief, but it was when the entire building was cleared, the team of which Zola was the leader left. But then page 13 of that brief said that Zola and Feisner continued with the search of both sides of the building for 3 hours. No, Your Honor, that's not correct. In fact, if you read the testimony, which I'm sure, yeah, Zola says that he was there for about 5 to 8 minutes, and that is at 334D, his notes of testimony. But the point is if he was in charge, Garrison makes it about as clear as possible that once you discover that you are in an area not covered by the warrant but for, in this case, some sort of search for protective purposes, you cannot do a more exhaustive search. You have to discontinue. Well, let me say two things about that, Your Honor. And they certainly continued on and did a full search of number 9. Whether Zola had left or not, he was the guy that was purportedly giving the orders. He was the guy in charge. No, Your Honor, he wasn't. Zola was in charge of the special operations group, which Feisner was in charge of the search. And Feisner entered after Zola had completed. So they weren't communicating? I'm sorry? So Zola realized he was in the wrong place. No, he didn't, Your Honor. And you would think that Feisner would have to realize that once he saw that there was a separate kitchen. Well, I think the issue, Your Honor, is not so much whether he thought there were two residences but whether a reasonable officer could conclude that they were connected by a common doorway in the bathroom. And I think that's what these officers reasonably believed. Well, the doorway that you really had to apply some force, however much we don't know. Isn't that a material issue of fact of whether that doorway could be? I don't think so, Your Honor, because it's conceded that Officer Zola was entitled to go through that doorway, to secure the premises just beyond it. Okay. He was entitled to go through it. Yes, Your Honor. The fact that it was difficult, arguably, to go through it. Should that not have been a fact to consider when you realize there are two kitchens, when you realize that there are two units? I don't think so because, Your Honor, Officer Feisner, who subsequently was in charge of the search, says that when he went through it, the door was open. And he says that he didn't notice the tape. Okay, but there's a material issue of fact of whether the door had to be kicked or not. Well, I don't think it's relevant to the issue of what the officer who conducted the search knew at the time. In other words, he says, undisputedly, that he did not see the tape. And there's no dispute. I gather the defendants are saying nobody kicked the door. But the plaintiff is saying someone kicked the door. Right. So whether or not someone kicked the door, is that not indicative of whether these were two separate units? I'm not saying it's indicative. I'm not saying they shouldn't have gone through and done a security search. But when they suddenly realize that there are two units, isn't that a fact that should have entered into their thinking about, is this a different unit? Well, I suppose it might have entered into their thinking, Your Honor. But I don't think it's a material fact because there's no question that the door wasn't properly secured, at least in the officer's view. Well, but that's the officer's view. Yes. And we have to look at the plaintiff's testimony about what happened, that they had to kick the door to get through. Right. Well, they had to kick the door. They saw that there was clearly a different unit. You had a separate kitchen. You had the Taverases, who were obviously not Guerrero. And you've got a Supreme Court case that says that you need to discontinue. Or, in this case, I suppose what you possibly could have done was gone back and said, okay, we're going to stop here, and I'm going to go back, and I'm going to get a warrant to search number nine, based on whatever reasons. That wasn't done. Well, Your Honor, no, it wasn't. And when one of the ICE agents told Officer Feisner that he had been told by one of the interviewees that it was a separate unit, then they did retreat shortly thereafter. What made Feisner, for example – I mean, Zola and Feisner, they're together, right? Only very briefly. But Zola goes through, and he realizes this is not number 11. So he does – did he not communicate that to anyone else? He did not, Your Honor. The testimony is that he didn't. He just sort of just – He left. And, well, let me explain, Your Honor, though, that what he said was – he said, in my opinion, this was one residence. I don't care what numbers you put on the outside. This building is one residence. It was not divided. And that, I think, is why he didn't, because he thought it was – the two residences were connected. I thought that – Zola, you said that? Zola said that. And, Your Honor, that's at 341D in the appendix. Notes of testimony – But wasn't there also something in evidence that he knew that there were a number 11 and a number 9 unit? Oh, yes. He did know that. I think there was evidence to that effect. So he goes in, and somehow, by virtue of seeing this door – oh, I was wrong. There's no number 11 and number 9 there. They're the same. Then he goes through the door and realizes, oh, yep, I clearly was right the first time. There are two units. And there's no Guerrero. I'm sorry, Your Honor. There are two units. Once he goes through that door, he realizes, whoops, these are two units. They're separate units, and this is a family in here that we have no – at this point, we don't know who they are, but they're not Guerrero. Well, again, Your Honor, our point is that it is reasonable – a reasonable officer could have concluded, based on the fact there's an interior door in the bathroom that is apparently unsecured or lightly secured. Well, but we don't know that. The two units – That's an issue of fact. Well – It had to be – there's a door in there that had to be kicked through. Well, that is what is contended, Your Honor. That's in looking at qualified immunity that we have to give credit to what the plaintiff is saying. Well – And if there is an issue of material fact like that, then it's improper at this point of the proceedings to grant qualified immunity. Well, Your Honor, all I can – what I can say is that we think that it is rather a slim read to deny qualified immunity on that issue. And just direct your attention again to the Torres case, which we've cited, which goes to the fact that the law is not clearly established, that if there is an indication of common access or control, that the two units can be considered one for purposes of the warrant. But it's pretty clear that once they went in and they saw another family living there, it wasn't common control. Well – And it's also common control of the person who is the target of the search. Your Honor, in Torres – That's Guerrero. In Torres, though, the court has stated the case – the issue in the disjunctive, and we think for that reason the law is at least not clearly established. But didn't Torres – in Torres, didn't the – I guess the target have access to the entire building? Is there evidence here that Guerrero had access to the entire building, except for that he was in the doorway one time? Well, there might have been, Your Honor, because of the common door in the bathroom. I mean, it's an interior door, and we think it's reasonable for the police officers to have concluded that there was common access for that reason. You know, the cases that might support you, or where you have a particular floor and then you – an upper floor and then you also have an attic, or you have a lower floor and you might have a basement. But this happens in countless residences, you know, with semi-detached buildings. Throughout America. And you've got an officer saying he knew. He knew beforehand there were two units. He knew once he went into number nine and went through that door that it was a separate unit. And then you're stuck. You can do a protective sweep, but beyond that, if you want to go further, you've got to go get another warrant. Not done. Okay. Let me ask you one other question. Oh, yes, Your Honor. The state officers, why did they send Mr. Tavares' son to the armory for further immigration checks? Well, actually, Officer Feisner does not recall ordering that or directing that he be sent. Who sent the 16-year-old son? That was Officer Gallagher. Officer Gallagher took him to the armory. He doesn't remember who directed it. Wasn't he supposed to take him to school? To do that. I'm sorry? Wasn't he supposed to take him to school? Apparently there was some issue with immigration, some question of immigration, which is why he was taken to the armory by Officer Gallagher, who's no longer a defendant. But who said that they had said that they would take the 16-year-old son to school? I honestly don't recall, Your Honor. And they also had the young man in handcuffs, didn't they? That I don't remember either. Again, what I can say is that there is no evidence that Officer Feisner is connected with that. Well, also, they made the 16-year-old then walk to school after three hours at this armory. Yeah, nobody even took him. Yes, Your Honor. Don't get it right from Officer Gallagher is the lesson here, right? Well, he dropped him at the armory, and the folks at the armory apparently didn't attend to him. Thank you, Your Honor. Thank you. Mr. Judge? At the danger of my time, Mr. Judge. May it please the Court, my name is Timothy Judge. On behalf of Immigrations and Customs Enforcement Agents Dave Cristino and Dane Epley. Two points I'd like to make on behalf of the agents. Just a fact question. Did Officer Cristino's threat take place after the ICE agents determined that Taveras was or was not a legal alien? I don't believe it's clear from the record, Your Honor. It was at one point in the record alleged to have occurred in the first floor kitchen of the Taveras residence, which would indicate that it would be towards the end of the time at the premises of 9 and 11 West Monroe Avenue. But I don't think the timing of when the statement occurred is clear from the record before the Court. Initially, the Taveras family states that their claim against the immigration agents is premised on an equal protection claim. Even if that statement was made that for him to shut up or he would be cuffed again because he's not a U.S. citizen, it doesn't rise to an equal protection violation. As the Court, as the Fifth Circuit observed in Retro Club v. Hilton, speech alone cannot constitute an equal protection violation. Additionally, the plaintiffs never pleaded in their amended complaint, nor has the Taveras family indicated in any of their briefs to this Court what the similarly situated persons who were treated differently are. There is no comparative classification. Well, as a matter of fact, the equal protection was first raised in the opposition to summary judgment, right? That's correct, Your Honor. And because of that, the claim fails on those two bases. First, that the equal protection claim cannot be established solely on speech alone, and second, because there's no comparative class of similarly situated persons who are treated differently, alleged. Second, the immigration customs agents should be afforded qualified immunity, even if speech alone could constitute an equal protection violation. It was not clearly established at the time that the alleged statement was made. Additionally, Special Agent Epley, on an additional and alternative basis, should be granted qualified immunity. Bystander liability, as it's alleged, he stood by and did nothing in response to the alleged statement. Bystander liability has not been extended beyond the excessive force context. Because it wasn't clearly established that he had a duty to respond in the equal protection context, and because there was no reasonable opportunity to intervene in any potential violation, because this was speech alone with no further conduct, Agent Epley should also be afforded qualified immunity on that additional and alternative basis. If the Court has no further questions. No further questions. I thank the Court for its time and consideration. Mr. Norton. With respect to Officers Feisner and Zola, one thing I think that is clear from the record is that, yes, Zola was the head of the entry team, Feisner was in charge of the search team, but they planned this together. They met together before the raid. They talked specifically about the possibility that there were two units here, number 9 and 11, and then Zola, we think, had a responsibility, and we found out it was number 9, to communicate that to Feisner. The immigration issue with respect to Wilfredo, that was determined early on by the ICE agents, and Feisner testifies that he believes that Wilfredo, the young boy, was taken down to the armory to check his immigration status, but the ICE agents say, we had checked his immigration status early on and we had told Feisner that he was clear, and so there's a conflict between what Feisner says and what the agents say as to why he was sent downtown. But why were the immigration agents on the raid to begin with? Was Guerrero, was he an illegal alien? Why were the immigration agents? I don't know that. I think they were there, they were called in, I think, to assist with the raid because they thought they had some language abilities. I don't think they had too much. And that they wanted to check immigration status. These were all Hispanics in this area. They wanted to check immigration status of the people that they saw. But when they got on the team, they were assigned other tasks. They actually, one of the agents admitted he cuffed somebody. They participated in the search and they were granted the authority to be the custodians of the people while on the raid. The other thing that hasn't been mentioned is that they took money. Yeah, has that ever been returned? That has never been returned. They took cash, $605 from Mr. Tavares, never been returned. Who took the money, Zola, Feisner? Feisner took the money. I think his testimony is clear on that. Have you filed any type of motion or started any type of process to get that money back? This is the process, Your Honor. Okay. Thank you. Actually, may I ask, Mr. Coons, has the money never been returned? I'm sorry, Your Honor? Do you know why the money has never been returned? The money is in the custody of either the court or the police and it would be the subject of any forfeiture petition to get it back. Under what possible grounds? You can come up to the mic. I'm sorry. Under what possible grounds? No, it was inventoried and there was a search and the money was – But they were cleared, right? Well, the money was seized and nobody was ever charged, but all I'm saying is the money is still in official custody. Why don't you give it back? And I think there are avenues to give it back. Judge Schwartz. Aren't there avenues on your part to give it back if you shouldn't have taken it? I honestly don't know, Your Honor. Maybe I'll look into that. Yes. Okay. Thank you, Your Honor. All right. Thank you. Thank you to all counsel. We'll take the matter under advisement. Thank you. Thank you. Thank you. Thank you.